UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN E. FREIBURGER and PARTNERS WEALTH MANAGEMENT, INC., | |
| Plaintiffs, | No. 13 CV 8174 |
| v. | Judge Manish S. Shah |
| KEVIN J. TIMMERMAN, BRADLEY J. LEWIS, STEELE CAPITAL MANAGEMENT, INC., | |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Since 1998, plaintiffs John Freiburger and Partners Wealth Management, Inc. had an arrangement to solicit clients for defendant Steele Capital Management, Inc., an investment management services company, in exchange for referral fees. Around fifteen years later, plaintiffs approached clients about transferring their accounts away from Steele Capital and to plaintiffs' new platform, and over 80 clients left Steele Capital. Defendants Kevin Timmerman and Brad Lewis (employees of Steele Capital) corresponded with clients in an attempt to keep them from transferring accounts. Asserting that the letters were defamatory, plaintiffs brought claims against all defendants for defamation *per se* (Count I), tortious interference with prospective business relations (Count II), commercial disparagement (Count III), and claims for breach of contract and unjust enrichment

against Steele Capital (Counts IV and V). [1].[1] In turn, Steele Capital brought counterclaims against plaintiffs for unjust enrichment and tortious interference with business expectancy (Counterclaims II and V) and counterclaims against Freiburger alone for breach of contract (Counterclaims I and VI) and breach of fiduciary duty (Counterclaim IV). [75].[2]

Plaintiffs move for summary judgment on all of Steele Capital's remaining counterclaims. [140]. Defendants move for partial summary judgment on plaintiffs' claims for defamation, commercial disparagement, and breach of contract. [135].[3] Lewis did not file a separate motion for partial summary judgment, but submitted an additional memorandum of law for partial summary judgment on plaintiffs' claims against him for defamation *per se* and commercial disparagement. [138].[4]

---

[1] Bracketed numbers refer to entries on the district court docket. To the extent this opinion references any document previously filed under seal, the seal is lifted and the party that originally filed that document must file on the court's docket an unredacted, public version of the same. *See City of Greenville, Ill. v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014). Subject-matter jurisdiction exists because the plaintiffs are from Illinois (Freiburger is domiciled in Illinois, Partners Wealth is an Illinois incorporation with its principal place of business in Illinois), the defendants are from Iowa (Timmerman and Lewis are domiciled in Iowa, and Steele Capital is incorporated in Iowa with its principal place of business in Iowa), and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

[2] Steele Capital's counterclaim against Freiburger and Partners Wealth for slander *per se* (Counterclaim III) was dismissed. [84].

[3] Defendants filed a second amended memorandum of law and second corrected LR 56.1 statement of facts. [162]; [163].

[4] By participating in defendants' motion while purporting to bring his own separate motion for summary judgment (which consisted only of an additional memorandum of law), Lewis essentially gained additional briefing without following the proper procedures for bringing a motion for summary judgment, as outlined Local Rule 56.1. Plaintiffs made no objection, however, and so the court will consider his arguments except those relating to plaintiffs' breach of contract claim (Count IV), which was brought only against Steele Capital.

For the following reasons, plaintiffs' motion to strike portions of defendants' reply brief, [183], is granted, defendants' motion for partial summary judgment on Counts I, III, and IV, [135], is granted, and plaintiffs' motion for summary judgment, [140], is granted in part on Counterclaims II and VI and denied on the remaining counterclaims.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). For each motion, factual inferences are viewed in the nonmovant's favor. *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

## II.    Background[5]

The parties in this lawsuit were all involved in the financial services and individual wealth management business. [155] ¶ 8.[6] John Freiburger was the sole owner of Partners Wealth Management, Inc., a general services financial planning firm that originated clients for a variety of financial services. [170] ¶ 5; [181] ¶ 4. He was also a "Registered Representative" of NFP Securities, Inc. in NFP Securities's broker/dealer capacity and an "Independent Advisor Representative" of NFP Securities in its "Registered Investment Advisor" capacity.[7] [155] ¶ 2; [170] ¶ 7; [181] ¶ 4. Located in Iowa, Steele Capital Management, Inc. was a "Registered Investment Advisor" and provided investment advisory services to individuals and company-sponsored retirement plans.[8] [170] ¶¶ 2–3. (Partners Wealth was not a

---

[5] In responding to each other's LR 56.1 statements of fact, in many instances, the parties' denials (and motions to strike) are overbroad (in that they concern only one aspect of a given factual statement), are argumentative, or cite record evidence that does not properly controvert the factual statement. The purpose of Local Rule 56.1 is to permit the district court to identify at summary judgment which material facts are in dispute. The parties' Rule 56.1 statements and responses are viewed with this principle in mind. Unless otherwise noted, the facts related below are undisputed or are considered undisputed because the responding party did not properly controvert the factual statement as required by local rule.

[6] [155] is defendants' response to plaintiffs' LR 56.1 statement. [170] is plaintiffs' response to defendants second corrected LR 56.1 statement. [181] is defendants' response to plaintiffs' additional LR 56.1 statement.

[7] The parties inconsistently refer to "NFP," "National Financial Partners Corp.," "NFP Securities, Inc.," and "NFP Advisor Services, Inc.," but this appears to be the same entity, at least as far as the parties are concerned. *See, e.g.,* [14] ¶¶ 9–10; [105] ¶¶ 2–3, 24; [155] ¶ 19; [170] ¶ 7. Because the Client Referral and Services Agreement at issue refers to "NFP Securities, Inc.," [75-2], this opinion refers to "NFP Securities."

[8] The statute spells the term "adviser" with an "e," 15 U.S.C. § 80b-2(a)(11), but the parties here use the common alternate spelling, "advisor." This opinion follows the parties' usage.

4

Registered Investment Advisor. [170] ¶ 6.) Kevin Timmerman co-owned Steele Capital, and Brad Lewis was its Senior Portfolio Manager. [170] ¶¶ 2, 4.

In 1998, Freiburger and Steele Capital entered into an oral agreement. In exchange for referring clients to Steele Capital, Freiburger would receive a percentage of the fees that those clients paid to Steele Capital. [155] ¶ 11. This agreement was to continue so long as the clients used Steele Capital for their investment management purposes. [155] ¶ 12. Two years later, Freiburger and Steele Capital memorialized their oral agreement by executing a "branch office agreement," which was terminable with six months written notice. [155] ¶ 14; [170] ¶ 24; [137-10].⁹ Timmerman signed on behalf of Steele Capital. [155] ¶ 15.

The branch office agreement stated that Freiburger was an "independent contractor" who would operate his financial services business as a branch office of Steele Capital and be an "Investment Advisor Representative" of Steele Capital. [137-10] at 1, 3. Under the agreement, Freiburger would be paid 60% of the client fees he brought to Steele Capital. [155] ¶ 22; [137-10] at 1. (At some later point, the percentage was raised to 65%—the parties do not explain when or how the change came about. *See, e.g.,* [170] ¶¶ 23, 56, 60.) Steele Capital paid Freiburger a higher referral fee than other solicitors because Freiburger agreed to provide more services than typical solicitors. [170] ¶ 25. The branch office agreement contained an exclusivity clause, which required Freiburger to "place all investment management

---

⁹ Defendants object that the branch office agreement did not completely memorialize terms from the parties' oral agreement, but cite no record evidence to controvert plaintiffs' statement of fact. [155] ¶ 14. Under LR 56.1, the fact is admitted.

business with [Steele Capital]" but allowed Freiburger to place Registered Investment Advisor business with another advisor if the services that a client desired fell outside Steele Capital's normal course of business. [155] ¶ 17; [137-10] at 1. The branch office agreement also contained an integration clause stating that the agreement "contains the entire understanding of the parties with respect to the subject matter hereto and shall not be modified or terminated except by written instrument executed by or on behalf of the party against whom modification or termination is sought to be enforced." [137-10] at 3.

From 2000 to 2004, Freiburger was an Investment Advisor Representative of Steele Capital and actually signed client contracts on behalf of Steele Capital. [170] ¶ 30.[10] While the branch office agreement was in place, Freiburger also served as a Registered Representative for NFP Securities, Inc., a broker/dealer. [155] ¶ 19; [170] ¶ 7. The parties generally agree that NFP Securities eventually insisted on having its own agreement with Steele Capital, but dispute whether Steele Capital and NFP Securities did so to comply with the Securities & Exchange Commission's Rule 206(4)-3 (regarding cash payments for client solicitations) or for other reasons. [155] ¶¶ 23–24; [170] ¶ 16. In 2004, Steele Capital and NFP Securities entered into a "Client Referral and Services Agreement." [155] ¶ 24; [170] ¶ 16; [75-2]. Once again, Timmerman signed the agreement on behalf of Steele Capital. [155] ¶ 25. Freiburger did not sign the agreement. [75-2] at 4.

---

[10] Freiburger notes that he was also an Investment Advisor Representative of WNA Investment Program, another Registered Investment Advisor. [170] ¶ 30.

Pursuant to the client referral agreement, NFP Securities would allow its registered representatives to solicit clients for Steele Capital on a "non-exclusive basis." [155] ¶ 25; [75-2] at 1. Steele Capital would pay NFP Securities for all services rendered by NFP Securities registered representatives, and NFP Securities would, in turn, pay its registered representatives. [155] ¶ 27. Clients referred to Steele Capital would sign a disclosure statement stating that NFP Securities and Freiburger were being paid a referral fee by Steele Capital. [170] ¶ 22; [75-2] at 1, 5. Each client using Steele Capital's wealth management services signed an Investment Management Agreement with Steele Capital, which stated that "[t]his agreement may be terminated by either party at any time without penalty upon written notice." [155] ¶¶ 38–39. Steele Capital had no recourse against clients who terminated their Investment Management Agreements; instead, clients were free to transfer their accounts. [155] ¶¶ 40–41.

In 2012, Freiburger informed Timmerman that he would be transferring millions of dollars in client accounts from Steele Capital to NFP Securities's platform. The parties dispute the timing and extent of that conversation. Timmerman recalls a phone call in August 2012 when Freiburger said that he was having financial difficulties and needed to move $50 million away from Steele Capital to NFP Securities in order to increase his revenue. [170] ¶ 32; [137-2] at 32–33. Freiburger does not recall a particular phone call in August and denies that he was in financial difficulties or needed to increase revenue, but he admits that at some point, he informed Timmerman that he would be moving $30 million away

from Steele Capital to NFP Securities. [170] ¶ 32; [137-6] at 149–52. Freiburger received a letter from NFP Securities in July 2012 about transferring client assets to NFP Securities's investment platform—the parties dispute whether Freiburger was required to move assets pursuant to the letter. [170] ¶ 45.

During the parties' relationship, Freiburger referred 118 clients to Steele Capital. In 2012, he approached clients about transferring their accounts to NFP Securities's new platform. [181] ¶ 12.[11] Around the end of 2012, clients started transferring their accounts; over the next year or so, a total of 84 clients transferred over to NFP Securities. [170] ¶ 52; [181] ¶ 12. It is undisputed that Freiburger could not transfer accounts on his own initiative, but could only do so upon client authorization. [155] ¶ 48. Timmerman sent Freiburger a letter on July 31, 2013, stating that Steele Capital was formally terminating the branch office agreement. [170] ¶ 31; [137-34]. For the few clients remaining with Steele Capital, Timmerman reduced Freiburger's referral fee to 50%. [170] ¶ 60. None of the clients who transferred to the NFP Securities platform ever returned to Steele Capital. [170] ¶ 66.

From April to October 2013, Timmerman and Lewis sent letters and emails to clients, which form the basis for plaintiffs' defamation claims. [170] ¶ 63;[12] [137-37]. Timmerman authored five emails and letters sent on April 8, June 11, July 8

---

[11] Defendants dispute Freiburger's characterization that he merely "offered" clients the option to transfer. This fact is referred to, however, merely to explain the background context for the parties' dispute.

[12] The statement of fact states that the letters span from February to October 2013, but there is no February letter in the record.

(two identical letters), July 15 (a letter sent to 80 clients), and September 3, 2013. [170] ¶ 61; [137-37] at 1–11. Lewis wrote two emails, sent on October 24 and October 29, 2013. [137-37] at 12–13. Plaintiffs filed suit shortly thereafter.

## III.    Defamation *Per Se* (Count I)

Defendants move for summary judgment on plaintiffs' claim for defamation *per se* on the basis that their statements were non-defamatory, true, subject to an innocent construction, privileged, or a combination thereof.

"A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with him." *Solaia Tech., LLC v. Specialty Pub. Co.*, 221 Ill.2d 558, 579 (2006).[13] A statement is defamatory *per se*—meaning that special damages need not be shown—"if its harm is obvious and apparent on its face." *Id.* In Illinois, statements considered defamatory *per se* include: words that impute a person has committed a crime; words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; and words that impute a person lacks ability or otherwise prejudices that person in her or his profession. *Id.* at 580. "Although a statement may fit into one of these categories, this fact, standing alone, 'has no bearing on whether the alleged defamatory statement is actionable,' because certain factors may render defamatory statements non-actionable as a matter of law." *Giant Screen Sports v. Canadian Imperial Bank Of*

---

[13] The parties cite Illinois law on the defamation claim.

*Commerce*, 553 F.3d 527, 532 (7th Cir. 2009) (quoting *Hopewell v. Vitullo*, 299 Ill.App.3d 513, 518 (1st Dist. 1998)).

The defendants moved to dismiss the defamation claim under Rule 12(b)(6) by arguing in a single paragraph—without citation to authority—that they had no malicious intent and therefore could not be held liable for defamation *per se*. At that stage of the case, such a conclusory argument was insufficient to show that plaintiffs had no cause of action for defamation *per se*. Now, on a full record and with the benefit of the parties' briefing the nature and truth of the statements at issue, the allegedly defamatory nature of defendants' statements can be resolved as a matter of law.

A defamatory *per se* statement is not actionable "if it is reasonably capable of an innocent construction"—a question of law. *Solaia Tech.*, 221 Ill.2d at 580. Statements that can reasonably be interpreted to refer to someone other than the plaintiff, or to have an innocent construction, are not actionable for defamation *per se*, and "[t]here is no balancing of reasonable constructions." *Id.* (quoting *Mittelman v. Witous*, 135 Ill.2d 220, 232 (1989)). But courts "should not strain to see an inoffensive gloss" when the defendant "clearly intended and unmistakably conveyed a defamatory meaning." *Id.*

Defamatory *per se* statements are also nonactionable if they are expressions of opinion, but "a false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole." *Solaia Tech.*, 221 Ill.2d at 581. The test for determining whether a statement is opinion or factual assertion

requires considering: (1) "whether the statement has a precise and readily understood meaning;" (2) "whether the statement is verifiable;" and (3) "whether the statement's literary or social context signals that it has factual content." *Id.*

Statements that are "substantially true" are also not actionable. Substantial truth "is shown where the 'gist' or 'sting' of the allegedly defamatory material is true." *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 42; *see Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993). Substantial truth is normally a question for the factfinder, but it is a question of law when no reasonable jury could find that the statement was not substantially true. *Coghlan*, 2013 IL App (1st) 120891, ¶ 42.

Privilege is also a defense to defamation. *Solaia Tech.*, 221 Ill.2d at 585. Other than a passing reference to the concept, defendants' opening brief did not develop any argument for how Timmerman and Lewis's statements were privileged. [162] at 5. Half of defendants' reply brief, however, was devoted to explaining how privilege applied to make their statements nonactionable. [180] at 4–6, 8–12. "[I]t is well-settled that arguments first made in the reply brief are waived." *Billhartz v. C.I.R.*, 794 F.3d 794, 801 n.4 (7th Cir. 2015); *see Bakalis v. Golembeski*, 35 F.3d 318, 326 n. 8 (7th Cir. 1994) (argument waived where it was made in a footnote in the opening brief and was "not developed fully until the reply brief"). Plaintiffs' motion to strike the portions of defendants' reply brief advancing a privilege argument, [183], is granted.

With these principles in mind, each letter is addressed below.

### A. April 8, 2013 Timmerman Email

Timmerman's April 8, 2013 email to a client ([1] ¶ 16; [137-37] at 1–2) contained ten statements that plaintiffs allege were defamatory.

1) "[W]e have been managing your account since July 2001 and I feel obligated to let you know that transferring your assets to John Freiburger's new platform is not in your best interests."

2) "Moving your account may be beneficial to John, but I can't see how it benefits you at all."

These statements are nonactionable opinion. Timmerman's use of the phrases "I feel obligated" and "I can't see how" would not, alone, shield a defamatory factual assertion from being actionable. *See Wilkow v. Forbes, Inc.*, 241 F.3d 552, 555 (7th Cir. 2001). But the terms "best interests," "beneficial," and "benefits" have no precise meaning and are not objectively verifiable. Such determinations are vague and highly subjective, as reasonable minds could differ about what is in a client's "best interest." Even Freiburger has admitted that reasonable minds could differ about whether an investment is in a client's best interest. [170] ¶ 62.[14] These terms are also not expressed in a context signaling that they are meant to convey specific factual content, which further suggests that they were intended to express Timmerman's subjective opinion. These statements are not actionable.

---

[14] Plaintiffs argue the context of the admission, but it was clearly made. When asked, "Could reasonable minds differ about the validity of a certain investment and whether it's in a client's best interest?" Freiburger responded "Certainly." [137-6] at 239.

3) "John informed us in August of 2012 that he was going to start moving accounts from us, and I believe you are the very first and only client to make the switch."

Plaintiffs assert that the second half of this sentence regarding the client is defamatory *per se*. In hindsight, defendants acknowledge that this client was not the first or only client to switch accounts, but argue that Timmerman believed this statement at the time. [181] ¶ 25. But because Timmerman is making the factual assertion that this client is the first to switch accounts, the qualifier "I believe" does not transform this statement into a nonactionable opinion. *See Solaia Tech.*, 221 Ill.2d at 580 ("[A] false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole.").

Regardless of the accuracy of this statement, however, it can be innocently construed. A statement is defamatory *per se* only "if its harm is obvious and apparent on its face," and falls into one of the defamatory *per se* categories. *Id.* at 579–80. Plaintiffs argue that this statement imputes that plaintiffs' lack integrity for recommending that clients leave Steele Capital when other clients do not think it is a good idea. From the perspective of an ordinary reader, and considering the context of the statement, a natural and obvious reading is that it offers no reflection on plaintiffs' integrity but instead focuses on the unnamed client. The statement "you are the first and only client to make the switch" reads as an appeal to herd mentality, suggesting that the client made a foolhardy decision and was unwise to leave Steele Capital because other clients have chosen not to do so. Clients could decide to not change investment management advisors for all sorts of reasons that do not reflect on plaintiffs' integrity—for example based on different investment

preferences or incentives. This statement can be innocently construed as not referring to or impugning plaintiffs' integrity or profession. It is not actionable.

> 4) "For soliciting you, we have been paying John 65% of your investment advisory fees."

This statement is a factual assertion, but it is substantially true—plaintiffs have even brought a breach of contract claim asserting that they are entitled to a 65% fee from Steele Capital for soliciting clients. *See, e.g.,* [1] ¶ 54; [172] at 2, 15. Whether Timmerman later reduced the percentage does not alter the fact that the "gist" of this statement is true. It is not actionable.

> 5) "The way John explained it to me, when you move to his new platform you will be paying 1.15% instead of 1.00%. However, if he doesn't get $50 million dollars on this new platform then your fee may go to 1.30%."

> 6) "By staying with John you will probably pay at least 1.15% but if you move back to us you will pay only 0.35%. This would save you approximately $4,240 per year (based on your account being $530,000)."

While Timmerman's statements may imply that he is merely offering his understanding of Freiburger's new platform, his statements include the factual assertions that the client's fee will increase to 1.15% or 1.30% if they transfer platforms. It is disputed whether transferring platforms would cause clients to be charged higher fees. *See, e.g.,* [170] ¶ 57. But statements that clients will be charged higher fees, even if false, do not impugn Freiburger's professional integrity or ability, and are not defamatory *per se*. "Words which reflect on a business's integrity or reputation may give rise to a defamation action," but "false prices do not impugn the integrity of the plaintiff." *Downers Grove Volkswagen, Inc. v. Wigglesworth*

14

*Imports, Inc.*, 190 Ill.App.3d 524, 531 (2d Dist. 1989) (brochure listing false prices for plaintiff's services was not defamatory, even *per quod*); *see Wilkow*, 241 F.3d at 557 ("[A]n allegation of greed is not defamatory."); *Garber-Pierre Food Prods., Inc. v. Crooks*, 78 Ill.App.3d 356, 360–61 (1st Dist. 1979) (letter accusing corporation of charging higher prices than its competitors was not defamatory *per se* because it amounted to criticism of plaintiff's policy decision regarding prices rather than impugning its business reputation).

Plaintiffs cite to *Installation Services, Inc. v. Crown Castle Broadcast USA Corp.* for the proposition that statements concerning "overcharging" and "gouging" are defamatory factual assertions. No. 04 C 6906, 2006 WL 2024220, at *5 (N.D. Ill. July 13, 2006). But the analysis in *Installation Services* relied on similar statements being found actionable in *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, No. 1-05-2744, 2006 WL 1766708 (1st Dist. 2006). That opinion was superseded and modified upon denial of rehearing by *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 367 Ill.App.3d 48 (1st Dist. 2006), which held that an ad stating the plaintiff was selling imitation goods of inferior quality could be innocently construed as referring to someone other than plaintiffs, and affirmed dismissal of the defamation *per se* claim. *Id.* at 57–58. On appeal, the Illinois Supreme Court affirmed dismissal of the defamation *per se* claim but held that the ad could not be reasonably interpreted as stating actual fact. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill.2d 381, 400–02 (2008). *Installation Services* and *Imperial Apparel* are not relevant to the point here—that describing a competitor's

price relative to one's own is not, without more, an attack on the competitor's integrity. Timmerman's assertions regarding plaintiffs' higher prices were not defamatory.

The statement about Steele Capital being willing to take the client back for only a 0.35% fee is also not defamatory *per se*—it merely represents Steele Capital's offer to that client. These statements are not actionable.

> 7) "If you sell everything to go into the funds John is recommending you could end up paying significant capital gains taxes."

Freiburger admitted that this statement was substantially true. [170] ¶ 57.[15] This statement is not actionable.

> 8) "The DFA funds that we believe John is recommending to you have not performed well."

The phrase "performed well" has no precise meaning and is not objectively verifiable, suggesting that it is merely an expression of opinion. Even if this were not opinion, it could be innocently construed as mere disagreement about investment strategy, not necessarily impugning plaintiffs' professional ability. This statement is nonactionable.

---

[15] Plaintiffs dispute this statement of fact by citing to Sommers' deposition testimony ([137-4] at 217: Q. "For capital gains tax reasons alone, I would not do it." You have already talked about that, correct? A. Yes.), but it is unclear what Sommers is testifying to and it fails to contradicts Freiburger's party admission. *See* [137-6] at 246 (Q. [Paragraph] G. "If you sell everything and go into the funds John is recommending, you could end up paying significant capital gains." Is that a true or false statement? A. For some clients if we sold everything, yes, there would be significant capital gains taxes.).

9) "Many sales people will try to sell you on the low expense ratios of the DFA funds. This is very misleading."

For context, this statement is followed by: "It would be like saying a Toyota Camry is better than a Mercedes Benz because it costs less. The bottom line with funds, just like cars, is how well they perform; and DFA funds have not been performing well." [137-37] at 2. Although the phrase "misleading" is tied to the factual context of selling DFA funds, it is not an objectively verifiable statement—there is no metric to determine whether selling DFA funds with low expense ratios is misleading or deceptive. For example, in *Hopewell v. Vitullo*, the statement that the plaintiff was "fired because of incompetence" was nonactionable opinion because "[r]egardless of the fact that 'incompetent' is an easily understood term, its broad scope renders it lacking the necessary detail for it to have a precise and readily understood meaning." 299 Ill.App.3d 513, 519 (1st Dist. 1998). Because the statement lacked "context and content" to limit the scope of "incompetent," there was no "precise meaning relating to the alleged defamatory statement" and the veracity of the statement was incapable of being verified. *Id*. at 519–20. Similarly, here, while "misleading" is an easily understood term, the statement that marketing based on the low expense ratios of DFA funds is misleading lacks sufficient factual context to make Timmerman's assertion verifiable. This statement can also be innocently construed to refer to salespeople generally, not necessarily Freiburger. It is nonactionable.

10) "I am guessing John told you not to take my phone calls; however, I would greatly appreciate an opportunity to speak with you. We have been managing your account for the past 12 years and it is very important that we talk."

This statement is not opinion, because it contains the factual assertion that Freiburger told the client not to accept phone calls from Steele Capital. Plaintiffs argue that this statement implies that they were trying to prevent clients from speaking with defendants, in order to conceal misconduct. However, the statement can be innocently construed—a businessperson can advise a client not to take phone calls from a competitor for all sorts of reasons that do not relate to concealing misconduct. This statement is not actionable.

The April 8 email from Timmerman does not contain any actionable statements.

## B.    June 11, 2013 Timmerman Letter

Plaintiffs allege that five statements from Timmerman's June letter are defamatory ([1] ¶ 18; [137-37] at 3). None of the statements are actionable for defamation *per se*.

1) "I feel obligated to let you know that transferring your assets to John Freiburger's new platform is not in your best interests."

The phrase "best interest" lacks a precise meaning and is inherently subjective. Whether transferring platforms is in a client's best interests is an unverifiable opinion. This statement is a nonactionable opinion.

2) "(Neither John nor anyone else at his office has been managing your account. John has merely been a paid solicitor for us.)."

This statement expresses the factual assertions that Freiburger was a paid solicitor for Steele Capital and did not manage client accounts. It is not disputed that Freiburger was a paid solicitor for Steele Capital, but plaintiffs have pointed to other evidence in the record suggesting that Freiburger was paid a higher referral fee because he provided more services than other solicitors and that account management may have been shared. But this statement, even if not substantially true, is not defamatory *per se*. Neither assertion implies that Freiburger lacked the ability or the integrity to provide financial planning services to clients. *See, e.g., Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 613 (7th Cir. 2013) (for defamation *per se*, a plaintiff "must show that he was falsely accused of lacking ability in his trade or of doing something bad while performing his job"). It is not actionable.

3) "Since August 2012, you are just one of a handful of clients that he has convinced to leave us and use his new platform."

This is a statement of fact, but, similar to the statement in the April 2013 email, it is not defamatory *per se* because it does not impugn plaintiffs' integrity or business acumen.

4) "It appears John has somehow convinced himself that raising your fee and using index funds is in your best interests. But how could it be? Charging a client 1.15% to construct a portfolio of index funds is ridiculous! **(If you want to come back to us we will manage your portfolio for .35%. This would save you approximately $13,500 per year).**" (Emphasis in original).

This statement largely consists of unverifiable opinion ("best interests") with rhetorical hyperbole ("ridiculous!") but it does contain the verifiable factual assertions that Freiburger charged a 1.15% fee and that the difference between a 1.15% fee and 0.35% would save the client $13,500 per year. Accusations that clients would be charged higher prices by Freiburger, however, do not rise to the level of defamation *per se*, as they offer no reflection on Freiburger's business abilities or integrity.

5) "I am troubled and embarrassed by what John is trying to do. I would greatly appreciate an opportunity to discuss this matter with you personally."

This statement is opinion, stating Timmerman's subjective feelings. It is neither verifiable fact, nor actionable as defamatory *per se*.

C.    **July 8, 2013 Timmerman Letters**

Timmerman sent letters to clients on July 8, 2013, which included five allegedly defamatory statements. ([1] ¶ 20; [137-37] at 4–5).

1) "When you receive your fee invoice from John Freiburger this quarter you will notice a much higher fee than what you were paying Steele Capital Management. As a friendly reminder, we are willing to take you back as a client and charge you 35% of the fee you were previously paying us."

2) "If you take this annual amount and compound it over the next ten years you will see a number that is very 'hard to swallow.'"

By stating that the client "*will* notice a much higher fee" not that they "*might*," the first sentence is not a subjective statement but instead Timmerman's assertion that he is "in possession of objectively verifiable facts," *Wilkow*, 241 F.3d at 555, specifically that the client will be charged higher fees by Freiburger. But while verifiable, these assertions are not defamatory—whether Freiburger charged higher fees is not reflective of either his business acumen or integrity. Moreover, whether higher fees would be "hard to swallow" is a nonactionable opinion, as it is imprecise and not objectively verifiable. *See, e.g.*, *J. Maki Constr. Co. v. Chicago Reg'l Council of Carpenters*, 379 Ill.App.3d 189, 199–202 (2d Dist. 2008) (handbill stating that homes built by nonunion construction company were "crappy" was nonactionable opinion).

3) "Inexplicably, John has decided that he is now capable of more than what we were charging you. He may try to make you believe that there is something magical about the DFA funds that justify his higher fee but don't believe it! If you want DFA funds we will use them (and not raise your fees)."

This statement is part nonactionable opinion and hyperbole ("something magical" and "don't believe it!"), but does contain the factual assertion that Freiburger was charging clients a higher fee. But the accusation that Freiburger charged higher fees is not defamatory *per se*.

4) "What John is doing creates a huge conflict of interest between him and his clients."

Typically, a statement that a person engaged in conflict of interest is a nonactionable opinion.[16] *Coghlan*, 2013 IL App (1st) 120891, ¶ 48. For example, in *Coghlan*, the moderator of a business association listserv intercepted a listserv submission by offering her own company's services and was accused of engaging in a "classic conflict of interest." That statement was a nonactionable opinion (and substantially true under the circumstances). However, *Coghlan* recognized that because "some conflicts of interest are crimes," in certain circumstances, a false allegation of a conflict of interest could "impute the commission of a specific crime and be actionable as defamation *per se*." *Id.* ¶ 47. Plaintiffs argue that Timmerman's accusation imputes that Freiburger committed a crime involving an investment advisor's fraudulent conduct or the failure to disclose conflicts of interest. *See, e.g.,* 15 U.S.C. § 80b-6 (it is unlawful for an investment advisor to engage in fraudulent conduct or business practices); 17 C.F.R. § 240.10b-5 (fraudulent conduct in connection with the purchase or sale of a security is unlawful); *Vernazza v. S.E.C.*, 327 F.3d 851, 860–61 (9th Cir. 2003) (investment adviser's failure to disclose potential conflicts of interest affirmatively misstated the nature of agreement to clients and established scienter required for violations of 15 U.S.C. § 80b-6(1) and 17 C.F.R. § 240.10b-5).

---

[16] Plaintiffs' implicitly acknowledge this in their response to defendants' LR 56.1 statements about whether plaintiffs and NFP Securities had conflicts of interest with clients. [170] ¶¶ 69–70. Plaintiffs responded, in part, by saying that statements about conflicts of interest were arguments and legal conclusions, not facts.

To determine whether Timmerman's statement imputes a crime, a court must look to whether his statement "create[s] a definitive factual context" for the use of the term "conflict of interest." *See Dubinsky v. United Airlines Master Exec. Council*, 303 Ill.App.3d 317, 330–31 (1st Dist. 1999). *Dubinsky* illustrates the line between nonactionable opinions and factual assertions imputing criminal activity. *Id.* at 325–31. Unlike the statements in *Dublinsky* that outlined criminal charges and accused plaintiffs of violating the law, Timmerman's statement about Freiburger's conflict of interest lacks a definitive factual context to make the statement objectively verifiable. Freiburger's alleged conflicts of interest are not presented as actual violations of the law. Timmerman does not identify the basis of conflicts between Freiburger and his clients with any specificity ("[w]hat John is doing"), although the paragraph implies some connection between conflicts of interest and Freiburger's relationship with a broker/dealer. [137-37] at 4 ("However, conflicts of interest are nothing new to John. While we are a Registered Investment Advisor, John sells commission products through a broker/dealer.").

But asserting the existence of conflicts of interest, alone, does not impute a crime. The crimes identified by plaintiffs require a showing of fraudulent conduct or the failure to disclose conflicts of interest, not merely conflicts of interest themselves. *See, e.g.,* 15 U.S.C. § 80b-6 (it is unlawful for an investment advisor to engage in fraudulent conduct or business practices); 17 C.F.R. § 240.10b-5 (fraudulent conduct in connection with the purchase or sale of a security is unlawful); *Vernazza*, 327 F.3d at 859–60. The statement does not suggest that

Freiburger concealed his conflict of interest, and so does not suggest that Freiburger committed a crime.

Moreover, plaintiffs acknowledged that NFP Securities and Partners Wealth have conflicts of interests with customers, although they disputed that the conflicts were numerous or undisclosed. [170] ¶ 69. Therefore, the "gist" of defendants' statements—that Freiburger has conflicts of interests with clients—was substantially true, and is not actionable for that additional reason. *See, e.g., Coghlan*, 2013 IL App (1st) 120891, ¶ 45 (the "gist" of the statement that listserv moderator engaged in a "classic conflict of interest" was substantially true where the moderator had intercepted a listserv submission for business services before posting it to the listserv).

> 5) "I am extremely confident if you knew all of the facts surrounding John's recommendations to move your investments, you would not have done so."

Plaintiffs do not respond to this specific statement in their opposition brief, and during discovery, Freiburger admitted that he did not know how this statement was false or defamatory. [170] ¶ 64.[17] While this statement could imply that Freiburger recommended that clients transfer their investments while concealing relevant facts, in the context of the letter, this statement could also imply that the client lacked relevant industry knowledge—for example, regarding DFA funds or

---

[17] Plaintiffs dispute this statement of fact as inaccurately summarizing Freiburger's testimony, but when asked how that specific statement was false or defamatory, he responded "I don't know." [137-6] at 260–61.

broker/dealers—such that they would be more reluctant to move investments. This statement is not actionable.

**D.  July 15, 2013 Timmerman Letter**

Timmerman sent a July 15, 2013 form letter with four allegedly defamatory statements ([1] ¶ 22; [137-37] at 6–8) to 80 clients.

> 1) "In August 2012, John announced to us that he wanted to move $50 million away from Steele Capital Management and put it into a new investment program. The reason he gave is pretty straight forward; it would enable him to make more money."

Whether Freiburger announced that he wanted to move $50 million away from Steele Capital to make more money is a factual assertion, and the parties dispute whether they are substantially true. But accusations that Freiburger wanted to make more money do not malign his professional integrity and are not actionable. *See also Wilkow*, 241 F.3d at 557 ("Capitalism certainly does not depend on sharp practices, but neither is an allegation of sharp dealing anything more than an uncharitable opinion.").

> 2) "On the one hand, I didn't want to lose clients to John's new program, but on the other, I understood John's business was struggling and he needed to do something to increase his revenue."[18]

"Struggling" is an imprecise term that, in isolation, is not verifiable and whether Freiburger needed to increase revenue is not objectively verifiable, as it is a broad statement that would be difficult to prove or disprove—there is no specific factual context tied to Freiburger's alleged need to increase revenue. For example,

---

[18] Plaintiffs' complaint identifies this statement to be in the July 8 letter, but it is only found in the July 15 letter.

in *Rose v. Hollinger International, Inc.*, upon the plaintiff's termination from a newspaper, the editor-in-chief emailed the editorial staff, stating that it would take time to undo the damage that the plaintiff had wrought to the newspaper's finances. That statement, however, was nonactionable opinion because "an attempt to prove or disprove the statement would entail an 'endless analysis of each and every fact connected with' the plaintiff's duties," and given the sparse information provided in context, the statement was "too broad, conclusory, and vague to be objectively verifiable." 383 Ill.App.3d 8, 18 (1st Dist. 2008) (quoting in part *Hopewell*, 299 Ill.App.3d at 520). If there were a specific factual context associated with Freiburger's alleged need to increase revenue—for example, if Timmerman stated that Freiburger was insolvent or could not pay his bills—then this might be a different story. *See, e.g., Wilkow*, 241 F.3d at 556 (colloquialisms such as "pleaded poverty" did not, in context, imply that plaintiff was destitute and failing to pay his personal creditors).

> 3) "After contemplating the situation and reviewing our client accounts, I quickly realized it was not in anyone's best interest to move to John's new platform. For capital gains tax reasons alone, I would not do it. Couple this with an increase in fees and it becomes impossible for me to endorse the new platform."

The term "bests interests" is imprecise and not verifiable, and Timmerman's inability to endorse the new platform reflects his subjective position. Although the statement includes the verifiable factual assertions that the client would incur capital gains taxes and increased fees if they moved to plaintiffs' new platform, neither assertion is defamatory *per se*.

4) "As awkward as it is, I feel I owe you this information so you don't make the mistake of moving your investments. Thankfully, over the past year only a few clients have been convinced to do so."

The first sentence is Timmerman's opinion that moving investments is a "mistake," and is not actionable. Whether only a few clients have been convinced to leave Steele Capital is a factual assertion, but it is not defamatory *per se*, as already discussed.

### E.     September 3, 2013 Timmerman Email

The four statements identified by plaintiffs in Timmerman's September 3, 2013 email to a client ([1] ¶ 24; [137-37] at 9–11) are nonactionable for defamation *per se*.

1) "We have been managing your account since 1998. Changing your investment advisor is a big decision and I hope you have done sufficient due diligence to ensure your new advisor is the best possible fit for you."

This statement reflects Timmerman's subjective opinion that changing investment advisers is a "big decision" and should be done with "sufficient due diligence." These statements lack precise meaning, are not verifiable, and are not given in a context suggesting that they are meant to be factual assertions. This statement is not actionable.

2) "I would recommend choosing a Registered Investment Advisor that is not affiliated with a broker/dealer."

This statement does not contain a verifiable factual assertion but instead reflects Timmerman's subjective recommendation. It is nonactionable.

3) "In other words, a broker/dealer can legally put their own interest above yours when recommending investments 'suitable' for the situation."

This statement is nonactionable. It is Timmerman's opinion, as there is no precise meaning about constitutes putting one's "interest" above another's interest when recommending "suitable" investments, and it cannot be objectively verified. Even if it contained a factual assertion, Freiburger admitted that this statement was true, and therefore it is not actionable. [170] ¶ 72.[19]

4) "If you would like to come back to our firm we would manage your portfolio for 0.50% per year."

This statement is not defamatory *per se* as to plaintiffs, as it does not even refer to them but instead reflects Steele Capital's offer to discount fees if the client returned. It is not actionable.

### F.    October 24, 2013 Lewis Email

Lewis, Steele Capital's portfolio manager, also sent correspondence to clients. Plaintiffs identify three allegedly defamatory statements in Lewis's October 24, 2013 email to clients ([1] ¶ 26; [137-37] at 12), but they are not defamatory, and the letter is not actionable.

---

[19] Plaintiffs deny this statement of fact, but his testimony was a clear admission: Q. [Paragraph] C. "In other words, a broker-dealer can legally put their own interest above yours when recommending investments 'suitable' for the situation." Is that statement false—true or false? A. True. [137-6] at 265.

1) "I understand that PWM has done a great job of putting 'spin' on their decision to move clients away from us. They want you to think we are the villain and that we are no longer cooperating with them in managing your portfolio."

This statement includes rhetorical hyperbole (e.g., "spin" and "villain") but does contain the factual assertion that plaintiffs wanted clients to think that Steele Capital was no longer cooperating in managing clients' portfolios. The "gist" of this statement, however, is substantially true, as Freiburger had sent a letter to clients about a month prior, stating that Timmerman "compromised our ability to service your accounts as we have been accustomed to servicing them in the past" and recommending that they move their accounts "away from Mr. Timmerman's control." [170] ¶ 51; [137-15]. This statement is not actionable.

2) "As a CPA and a Registered Investment Advisor, I have always been held to a fiduciary standard of care, requiring me to put my clients' interests ahead of my own. It appears PWM does not subscribe to this standard of care. I can't fathom any reason (that benefits you) for PWM to move your account to their broker/dealer's platform. **Please Google 'RIA versus broker/dealer' and you will see many articles explaining the conflicts of interest that exist with broker/dealers**." (emphasis in original)

Lewis's statement is akin to the "classic conflict of interest" statement in *Coghlan*, 2013 IL App (1st) 120891, ¶ 48. It is not objectively verifiable and did not impute a crime.

3) "I so strongly believe in what I do that **I will manage your account for free for the next two years** just for the opportunity to earn your business. I have worked too hard for my clients to sit by and watch PWM do what they are doing." (emphasis in original).

The portion of this statement referring to Steele Capital offering two years free is not defamatory to plaintiffs, as it merely reflects Steele Capital's offer. The

remainder of the statement about Partners Wealth "do[ing] what they are doing" is too vague to be actionable. It is not precise, nor verifiable, and it lacks specific factual context. Although it is preceded by Lewis's assertion that takes pride in "always doing what is in [the client's] best interests," the idea of what is in a client's "best interests" is too vague to make this statement actionable.[20]

### G. October 29, 2013 Lewis Email

Lewis's other email contains similar, nonactionable statements. [1] ¶ 28; [137-37] at 13.

1) "As a CPA and a Registered Investment Advisor, I have always been held to a fiduciary standard of care, requiring me to put my clients' interests ahead of my own. I can't fathom a reason (that benefits you) for PWM to move your account to their broker/dealer's platform. Please Google 'RIA versus broker/dealer' and you will see many articles explaining the conflicts of interest that exist with broker/dealers."

2) "I so strongly believe in what I do that I will manage your account for free for an entire year just for the opportunity to earn your business. I have worked too hard for my clients to sit by and watch PWM do what they are doing."

As previously stated, these statements are nonactionable. There is no additional context in this October 29 email to make them actionable.

---

[20] Whether a statement is defamatory is a legal conclusion, but it is worth noting that Freiburger admitted at his deposition that this statement was not defamatory. [170] ¶ 64; [137-6] at 270–71 (Q. This is not defamatory on behalf of Mr. Lewis, correct, those first two parts of the first sentence? A. First sentence, no. Q. And then the second sentence? A. I am just confused where he says I've worked too hard for my clients, and then I don't see them as being their clients. The client will decide for themselves where they will be. No, it's not defamatory.).

3) "I think you would be interested in hearing why the vast majority of clients solicited by PWM have stayed with us."

This statement reflects Lewis's opinion, but includes the factual assertion that the vast majority of clients solicited by Partners Wealth stayed with Steele Capital. That statement, even if inaccurate, does not impugn plaintiffs' integrity.

Because defamation *per se* does not require a showing of special damages, it is limited to narrow categories, and the harm from a statement must be apparent on its face. *Solaia Tech.*, 221 Ill.2d at 579. Defendants' communications to departing clients may have been aggressive, but that does not make them defamatory *per se*. *See, e.g., Imperial Apparel*, 227 Ill.2d at 401 (ad that was "artless, ungrammatical, sophomoric" and "a shameless appeal to ethnic prejudice" was not defamatory *per se*); *Wilkow*, 241 F.3d at 557 (allegation of greed was not defamatory); *J. Maki Constr.*, 379 Ill.App.3d at 200–02 (handbill referring to "crappy" homes built by plaintiff was not defamatory).

Defendants' motion for summary judgment on plaintiffs' defamation claim is granted.

## IV.    Commercial Disparagement (Count III)

Defendants also move for summary judgment on plaintiffs' commercial disparagement claim, which is pled in the alternative. To state a cause of action for commercial disparagement, plaintiffs' must show that defendants made "false and demeaning statements regarding the quality" of plaintiffs' goods and services. *Schivarelli v. CBS, Inc.*, 333 Ill.App.3d 755, 766 (1st Dist. 2002). Commercial disparagement cannot be based on expressions of opinion. *Soderlund Bros. v.*

*Carrier Corp.*, 278 Ill.App.3d 606, 620 (1st Dist. 1995) (citing Prosser & Keaton on Torts § 128). Although related, defamation and commercial disparagement are two distinct causes of action. "Defamation lies when a person's integrity in his business or profession is attacked while commercial disparagement lies when the quality of his goods or services is attacked." *Allcare, Inc. v. Bork*, 176 Ill.App.3d 993, 1000 (1st Dist. 1988). "[D]efamation and commercial disparagement protect different interests. Defamation protects interests of personality. Commercial disparagement protects property interests." *Id*.

Because plaintiffs are in the business of investment services and financial planning, there is some overlap between defamation and commercial disparagement in these particular circumstances. *See, e.g., Madison v. Frazier*, 539 F.3d 646, 656 (7th Cir. 2008) ("[S]ometimes personal integrity is so intertwined with job skills, that an attack upon it could constitute defamation *per se*."); *Allcare*, 176 Ill.App.3d at 1000 (false statements indicating that plaintiffs' "business practices were substandard, negligent or harmful" could be actionable under commercial disparagement). As addressed in the opinion denying defendants' motion to dismiss, because plaintiffs were in the investment advisory business, statements that Freiburger had conflicts of interests, did not act in his clients' best interest, and that the firm did not adhere to the requisite standard of care are reflections on the quality of plaintiffs' goods and services. [65] at 8–9. At the time of the motion to dismiss, however, the factual record had not been developed, and the defendants had not argued, as they do now, that these statements are nonactionable opinion. In

32

responding to defendants' motion for summary judgment, plaintiffs rest solely on the opinion denying the motion to dismiss and do not account for the different record and argument before the court.

Statements of opinion are nonactionable for commercial disparagement. *Soderlund Bros.*, 278 Ill.App.3d at 620. Defendants' statements about clients' best interests and Freiburger's conflicts of interest are nonactionable opinion for both the defamation claim and commercial disparagement claim.

Defendants' motion for summary judgment on the disparagement claim is granted.[21]

## V. Breach of Contract

### A. Plaintiffs' Breach of Contract Claim (Count IV)

Steele Capital moves for summary judgment on plaintiffs' breach of contract claim, arguing that Steele Capital properly terminated the branch office agreement by written notice after Freiburger began transferring clients and that therefore it could not have breached an agreement that was already terminated. Plaintiffs acknowledge that defendants formally terminated the branch office agreement in July 2013 ([172] at 2), but clarify that their breach of contract claim does not rest on the branch office agreement. Instead, plaintiffs refer to the allegations in their

---

[21] Lewis also argues that he should be dismissed because he was merely acting as Steele Capital's agent, but cites no authority for the proposition that an agent cannot be held liable for a tort committed at the direction of its principal. Instead, under Illinois law, they are jointly and severally liable. *See, e.g., Reed v. Nw. Pub. Co.*, 124 Ill.2d 495, 517 (1988) ("A corporation's liability for slander or libel is based on the doctrine of *respondeat superior*; a corporation is jointly and severally liable for libelous statements actionable against its employee when the employee is acting within the scope of his employment."). In any event, Lewis's statements are not actionable for defamation *per se* or commercial disparagement.

complaint that Steele Capital agreed to pay Freiburger a 60–65% referral fee and, alternatively, their allegations that this agreement arose through the parties' course of dealing.

At summary judgment, however, plaintiffs cannot rely on the mere allegations of their complaint—as the nonmovants, they must identify specific material facts showing that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. Indeed, plaintiffs acknowledge this maxim in support of their own motion for summary judgment on Steele Capital's counterclaims. *See* [182] at 7.

A breach of contract action must be predicated on a valid and enforceable contractual obligation. *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007).[22] Plaintiffs make clear that they are *not* asserting breach of the branch office agreement. But to move forward on their breach of contract claim, plaintiffs need to identify what contract they *are* seeking to enforce and need to identify genuine issues of material fact over whether that contract was breached. Pointing to allegations regarding an agreement about referral fees and the parties' course of dealing does not meet this requirement. Plaintiffs point out that Steele Capital continues to pay Freiburger referral fees for clients who remained with Steele Capital and that Timmerman reduced Freiburger's percentage from 65% to

---

[22] Steele Capital cites both Iowa law (because the branch office agreement has an Iowa choice-of-law clause) and Illinois law for the breach of contract claim. [162] at 15. Plaintiffs are not basing their breach of contract action on the branch office agreement, and the parties have not identified any relevant conflicts between Iowa and Illinois contractual law, so Illinois law will apply. *See Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n.7 (7th Cir. 1993) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we will apply the law of the forum state—here, Illinois.").

50% after the branch office agreement was terminated, but do not explain what agreement Steele Capital breached.

If plaintiffs intended to base their breach of contract claim on breach of the 1998 oral agreement—or a subsequent oral, written, or implied contract other than the branch office agreement—those arguments are undeveloped and waived. *See, e.g., United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties," and "perfunctory and undeveloped arguments" are waived.); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in [the record].").[23]

Summary judgment is granted to Steele Capital on plaintiffs' breach of contract claim.

## B. Steele Capital's Breach of Contract Counterclaims (I and VI)

Steele Capital asserts breach of contract claims against Freiburger for breaching the branch office agreement (Counterclaim I) and, alternatively, for breaching the parties' 1998 oral agreement (Counterclaim VI), both based on Freiburger's transfer of clients to a competitor. [75].

---

[23] Plaintiffs could not have based a breach of contract claim on the parties' 1998 oral agreement anyway. The oral agreement was memorialized in the branch office agreement, which had an integration clause. [155] ¶ 14; [137-10] at 3. As a result, the prior oral agreement had been entirely replaced. *See Magnus v. Lutheran Gen. Health Care Sys.*, 235 Ill.App.3d 173, 182 (1st Dist. 1992) ("It is well settled under the doctrine of merger and the parol evidence rule that a written agreement that is complete on its face supersedes all prior agreements on the same subject matter and bars the introduction of evidence concerning any prior term or agreement on that subject matter, particularly when the contract contains an unambiguous merger or integration clause.") (citations omitted).

For the same reason that plaintiffs could not have moved forward on a breach of contract claim based on the 1998 oral agreement, Steele Capital cannot maintain a claim for breach of the 1998 oral agreement—that agreement was replaced by the branch office agreement and no longer in effect at the time of the client transfer. Plaintiffs are granted summary judgment on this counterclaim.

Freiburger asserts that his branch office agreement with Steele Capital ceased to exist in 2004 because it was merged into Steele Capital's client referral agreement with NFP Securities. But the merger doctrine only applies to contracts entered into by the *same* parties: "no contract can be modified in *ex parte* fashion by one of the contracting parties without the knowledge and consent of the remaining party to the agreement, thereby making mutual assent as much a requisite element in effecting a contractual modification as it is in the initial creation of a contract." *Schwinder v. Austin Bank of Chicago*, 348 Ill.App.3d 461, 469 (1st Dist. 2004) (citations omitted).[24]

Although there was some overlap in subject matter between the branch office agreement and client referral agreement regarding payments for clients referred by NFP Securities's registered representatives (i.e., Freiburger), the agreements were executed between different parties. Freiburger did not sign the client referral

[24] Although the branch office agreement and client referral agreements both contain Iowa choice-of-law provisions, both parties waive any Iowa-law arguments by citing to Illinois law. In any event, under Iowa law a contract cannot be modified without mutual assent. *See Davenport Osteopathic Hosp. Ass'n of Davenport, Ia. v. Hosp. Serv., Inc., of Ia.*, 261 Iowa 247, 253 (1967) ("[O]ne party to a contract cannot alter its terms unilaterally or without assent of the other party."); Restatement (Second) of Contracts § 17 ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.").

agreement; even he acknowledges that, at most, he was a third-party beneficiary to it. Moreover, the client referral agreement lacked an integration clause and specifically contemplated the existence of collateral agreements between NFP Securities's registered representatives and Steele Capital. For example, it identified the appropriate referral fee percentage to be paid by Steele Capital as "a fee between 30% and 60% (depending on [Steele Capital's] agreement with each Registered Representative of [NFP Securities])." [75-2] at 2, § V.A. The client referral agreement did not entirely replace Freiburger's obligations under the branch office agreement.

In the alternative, Freiburger argues that Steele Capital is precluded from asserting breach of the branch office agreement because the parties did not strictly follow its terms (e.g., the exclusivity provision, and the existence of Freiburger's branch office) and instead followed the terms of the client referral agreement. Freiburger also asserts that Steele Capital failed to perform under the branch office agreement when Steele Capital routed referral fees through NFP Securities starting in 2004. These arguments, however, would require resolving whether the parties intended to modify the branch office agreement through their conduct (including their conduct after Steele Capital and NFP Securities entered into the client referral agreement in 2004). *See Maher & Assocs., Inc. v. Quality Cabinets*, 267 Ill.App.3d 69, 78 (2d Dist. 1994) ("A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance."). The parties might have acquiesced

to be governed by the client referral agreement in lieu of the branch agreement, but "[w]hether the terms of a written contract are modified by acts or conduct is a question for the trier of fact," *id.*, and resolution of these issues is not appropriate at summary judgment, on this record.[25]

Summary judgment on Steele Capital's counterclaim for breach of the branch office agreement (Counterclaim I) is denied.

## VI. Unjust Enrichment (Counterclaim II)

Freiburger moves for summary judgment on Steele Capital's counterclaim for unjust enrichment (Counterclaim II) on the basis that the branch office agreement, the client referral agreement, or a combination thereof governed the parties' relationship. Steele Capital responds that its unjust enrichment allegations should be allowed to stand as an alternative equitable remedy.

Under the doctrine of pleading in the alternative, "a party is allowed to plead breach of contract, or if the court finds no contract was formed, to plead for quasi-contractual relief in the alternative." *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003). "But a plaintiff may not pursue a quasi-contractual claim where there is an enforceable, express contract between the parties." *Id.* The branch office agreement was an express agreement between the parties, which may have been modified by the parties' actions (including the client

---

[25] Regarding Freiburger's argument that Steele Capital waived the exclusivity clause in the branch office agreement, the cited evidence in the current record is not sufficient to show waiver—Timmerman's admission that he knew that Freiburger was working with other Registered Investment Advisors was given in the context of the exclusivity clause's allowance for services outside Steele Capital's normal course of business. [155] ¶ 18; [137-2] at 13.

referral agreement between Steele Capital and NFP Securities). Steele Capital has pointed to no evidence that its arrangement with Freiburger was not governed by a written (if modified) agreement, and therefore it has not shown a triable issue over whether it is entitled to the quasi-contractual relief of unjust enrichment. *See Van Diest Supply Co. v. Shelby Cty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005) ("To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial.") (marks omitted). To defeat summary judgment on the unjust enrichment claim, Steele Capital needed to come forward with evidence that suggested that no contract governed the parties' relationship—some risk that a jury might conclude that no contract existed at all. Steele Capital has presented no such evidence.

Summary judgment is granted for Freiburger on Steele Capital's unjust enrichment counterclaim (Count II).

## VII. Breach of Fiduciary Duty (Counterclaim IV)

Freiburger argues that as a matter of law, he did not owe Steele Capital a fiduciary duty because he was not an agent, partner, or joint venturer, and that Steele Capital cannot show that any fiduciary duty was breached because all of its clients were "at will" and free to terminate Steele Capital's services at any time. In response, Steele Capital does not contend that Freiburger was an agent, partner, or joint venturer, but instead argues that a fiduciary relationship existed between the parties because Steele Capital placed a high-level of trust in Freiburger, by allowing

Freiburger to associate his business with Steele Capital's name and reputation and to access Steele Capital's confidential client account information.

Under Iowa law,[26] "[a] fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 138 (Iowa 1996) (quoting *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986)). "Factors indicating that a fiduciary relationship may exist 'include the acting of one person for another; the having and the exercising of influence over one person by another; the reposing of confidence by one person in another; the dominance of one person by another; the inequality of the parties; and the dependence of one person upon another.'" *Weltzin v. Cobank, ACB*, 633 N.W.2d 290, 294 (Iowa 2001) (quoting *Kurth*, 380 N.W.2d at 695). Whether Freiburger was an agent, partner, or joint venturer is relevant, but not dispositive of the issue of a fiduciary relationship. *See Wilson*, 558 N.W.2d at 139 ("Although domination and control are significant factors, neither are determinative by themselves."). Instead, "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case." *Id.* (quoting *Kurth*, 380 N.W.2d at 696).

---

[26] As held in an earlier opinion on defendants' motion to dismiss, Iowa law governs this claim because Steele Capital is an Iowa corporation, and the law of the state of incorporation applies when considering fiduciary duties in this context. [65] at 12. Freiburger accordingly cites Iowa law. Without addressing Freiburger's citation to Iowa authority or any conflict between Illinois and Iowa law on fiduciary duties, Steele Capital cites to Illinois law.

Steele Capital has referred to evidence in the record raising a triable issue of fact of whether a fiduciary relationship existed between Freiburger and Steele Capital. For nearly fifteen years, Freiburger solicited clients to place their investments with Steele Capital, and there are facts from which Steele Capital can argue that the parties were closer than a simple arm's-length business relationship, close enough for Freiburger to have gained Steele Capital's confidence and purported to act or advise with Steele Capital's interest in mind. *See Wilson*, 558 N.W.2d at 138. For example, Freiburger listed Steele Capital's name on his building directory and office mailbox; his picture and profile were on Steele Capital's website; he had a Steele Capital email address; his name was on the front door of Steele Capital's office; and Steele Capital used envelopes with its logo and Freiburger's mailing address. [170] ¶¶ 28–29. Steele Capital gave Dan Sommers (Freiburger's controller, accountant, and Director of Client Experiences) online access to Steele Capital's clients' investment information, and Sommers had multiple, daily conversations with Lewis, Steele Capital's portfolio manager. [170] ¶¶ 26–27. Other facts could also suggest that Freiburger had gained Steele Capital's confidence, including that: Freiburger served as an Investment Advisor Representative of Steele Capital from 2000 to 2004 and, during that time, signed client contracts on Steele Capital's behalf; Steele Capital paid Freiburger significantly more than it paid other solicitors; and the branch office agreement included an exclusivity clause (to the extent that clause remained in play or unmodified). [170] ¶¶ 25, 30. Taken together, these circumstances could suggest

that there was a level of trust and confidence between Freiburger and Steele Capital that created a fiduciary relationship. If there were a fiduciary relationship giving rise to Freiburger's duty to act for Steele Capital's benefit, then approaching clients about transferring to a competitor could be a betrayal of trust and abuse of confidence amounting to breach of that fiduciary duty. *See Wilson*, 558 N.W.2d at 138 ("[The] [p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence.").

Trial may reveal that the parties' relationship was simply an arm's-length business relationship, or that Steele Capital reposed no more trust and confidence in Freiburger than any other non-fiduciary solicitor. But the existence of a fiduciary relationship "must be evaluated on the facts and circumstances of each individual case," *Wilson*, 558 N.W.2d at 139, and there is evidence in the record creating factual disputes. Summary judgment for Freiburger on this counterclaim is denied.

## VIII.  Tortious Interference (Counterclaim V)

Freiburger seeks summary judgment on Steele Capital's counterclaim for tortious interference with business expectancy (Counterclaim V), on the basis that absent a showing of unfair competition, Steele Capital cannot establish that Freiburger tortiously interfered with Steele Capital's at-will contracts with clients.

Tortious interference with a business expectancy requires four elements: (1) the existence of a valid business relationship or expectancy; (2) the defendant's knowledge of plaintiff's relationship or expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship or termination of the relationship; and (4) damages to

plaintiff resulting from such interference. *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill.App.3d 365, 380 (1st Dist. 2004).[27] Mere business competition is insufficient to establish tortious interference. *See Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999). But "[w]hile one may not simply sue any competitor who lures away customers, the privilege of competition is not available to those who use wrongful means to interfere." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill.App.3d 849, 863 (1st Dist. 2008) (marks omitted). For this reason, the element of "purposeful interference" requires establishing that the defendant "has committed some impropriety" in causing termination of the relationship. *Dowd & Dowd*, 352 Ill.App.3d at 381. The impropriety here, Steele Capital argues, is that Freiburger encouraged clients to terminate their contracts with Steele Capital while he owed contractual and fiduciary duties to refer clients to Steele Capital and act in Steele Capital's interest. Steele Capital has identified factual disputes regarding the extent of Freiburger's contractual and fiduciary duties (if such duties existed). Therefore, it would be inappropriate to rule that, as a matter of law, Steele Capital cannot establish the element of purposeful interference.

Also, the fact that clients had an at-will contract with Steele Capital is not dispositive of whether Freiburger purposefully interfered with those contracts by actively inducing clients to leave Steele Capital. "The focus here is not on the conduct of the client in terminating the relationship, but on the conduct of the party inducing the breach or interfering with the expectancy." *Id*. At-will contracts are

---

[27] Both parties cite to Illinois law on this claim.

"sufficient to support an action for tortious interference" because "[u]ntil terminated, the relationship created by a contract terminable at will is subsisting and will presumptively continue in effect so long as the parties are satisfied." *Id.*

Freiburger's motion for summary judgment on this counterclaim is denied.

## IX. Conclusion

Plaintiffs' motion to strike portions of defendants' reply brief, [183], is granted. Defendants' motion for partial summary judgment on Counts I, III, and IV, [135], is granted. Plaintiffs' motion for summary judgment, [140], is granted in part on Counterclaims II and VI, and the motion is denied on the remaining counterclaims.

ENTER:

Manish S. Shah
United States District Judge

Date: 8/26/2016